IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| MICHAEL L. LABERTEW, attorney-in-fact for, and on behalf of, P.B., and as co-trustee of THE P.B. LIVING TRUST,<br><br><br>Plaintiff,<br><br><br><br>vs.<br><br><br>WINRED, INC.,<br><br>Defendant. | **ORDER AND MEMORANDUM DECISION DENYING SECOND MOTION TO DISMISS AND MOTION TO STAY AND COMPEL ARBITRATION**<br><br>Case No. 2:21-cv-555-TC |

Before the court are Defendant WinRed, Inc.'s (WinRed) second motion to dismiss for lack of subject matter jurisdiction (ECF No. 71) and WinRed's motion to stay and compel arbitration.  (ECF No. 43.)[1]  For the reasons stated below, the court denies WinRed's motion to dismiss, denies WinRed's motion to compel arbitration, and denies WinRed's motion for a stay but grants WinRed leave to file a renewed motion to compel arbitration after the close of a summary proceeding.

---

[1] The court has previously granted in part and denied in part WinRed's first motion to dismiss, dismissing Mr. Labertew's cause of action for theft.  (ECF No. 37.)

## BACKGROUND

Plaintiff Michael Labertew brings this action as the attorney-in-fact for P.B. (Mrs. B) and as co-trustee of The P.B. Living Trust.  (See Compl., ECF No. 2 at 1.)  Mr. Labertew represents Mrs. B's interests because Mrs. B, who is elderly, has severe memory loss, poor executive functioning skills, advanced dementia, and requires home care.  (Id. ¶ 2.)

WinRed is a for-profit fundraising platform for political candidates and campaigns that accepts contributions from its donors through at least two processes.  (Id. ¶ 4; ECF No. 27 at 9.)  For "one-time donations," a user makes a single, one-time donation to a given candidate or campaign on WinRed's platform.  (Compl. at ¶ 19.)  For a "recurring contribution," WinRed makes repeated, regular charges to a donor's credit card based on a donation transaction from hours, days, months, or years prior.  (Id.)  Mr. Labertew alleges that WinRed's use of the recurring charge feature requires "contributors to opt-out or edit the feature in order to avoid the recurring charges and contributions to Defendant's political action committee."  (Id.)  Mr. Labertew also alleges that WinRed has preyed upon senior citizens and vulnerable adults, including Mrs. B, through repeated email, internet, electronic, text and other telephonic solicitations and telemarketing campaigns.  (Id. ¶¶ 4, 13, 21–22, 25, 27.)

Mr. Labertew alleges that WinRed targeted Mrs. B despite knowing that, given her age and her disabilities, she is a vulnerable adult who does not have the capacity to make financial decisions.  (Id. ¶¶ 10–12.)  Mr. Labertew also asserts that WinRed continued its efforts to prey upon Mrs. B even after he sent them two cease-and-desist letters.  (Id. ¶¶ 28–29.)  Based on these allegations, Mr. Labertew brought three claims against WinRed for: (1) theft; (2) conversion; and (3) exploitation of a vulnerable adult.  (See id. ¶¶ 34–52.)

Shortly after Mr. Labertew filed his complaint, he filed a motion for a temporary

restraining order (TRO).  (ECF No. 3.)  The court granted this motion.  (Order granting TRO

dated Sept. 24, 2021, ECF No. 5.)  The court later dissolved the TRO (see Order Dissolving TRO

dated Oct. 8, 2021, ECF No. 20), and then granted Mrs. B a second TRO (see Order Granting

Second TRO dated Oct. 8, 2021, ECF No. 21).  In lieu of pursuing a preliminary injunction, the

parties stipulated that WinRed would refrain from contacting Mrs. B and obtaining any money or

property from her.  (Stipulation, ECF No. 23.)  The parties also agreed that if either party became

aware or reasonably suspected that Mrs. B was using or had attempted to use new methods of

payment to make contributions, that party would provide written notice to the other party as soon

as practicable.  (Id.)

On November 1, 2021, WinRed filed a motion to dismiss Mr. Labertew's claims.  (ECF

No. 27.)  WinRed argued that the court lacked subject matter jurisdiction because Mr. Labertew

lacked standing and had failed to allege an adequate amount in controversy.  WinRed maintained

that its platform was "simply a conduit to better assist individuals in donating to political

committees" and that it did not affirmatively solicit donations from anyone, including Mrs. B.

(Id. at 2.)  As evidence, WinRed attached a declaration from its President, Gerrit Lansing, which

stated that "WinRed does not solicit donors to make contributions via the website.  All

earmarked contributions that pass through the website are the result of marketing efforts and

solicitations made by the campaigns and committees who use the platform."  (Decl. Gerrit

Lansing ¶ 5, Ex. B to Mot. to Dismiss, ECF No. 27-2.)  According to WinRed, Mr. Labertew had

not adequately alleged conduct fairly traceable to WinRed and harm that could be redressed by a

decision from this court.  WinRed also contended that Mr. Labertew failed to state a claim upon

which relief could be granted.

The court granted in part and denied in part WinRed's motion.  (See Order & Mem.

Decision dated May 18, 2022, ECF No. 37.)  The court held that the amount in controversy requirement was met.  (<u>Id.</u> at 3–6.)  And the court found that Mr. Labertew's well-pled allegations withstood WinRed's argument about causation and redressability.  (<u>Id.</u> at 6–10.) Finally, the court dismissed Mr. Labertew's theft claim with prejudice for failure to state a claim (<u>id.</u> at 15), but allowed his claims for conversion and exploitation of a vulnerable adult to proceed.  (<u>Id.</u> at 19–20.)

On December 20, 2022, WinRed filed a second motion to dismiss for lack of standing and failure to show causation and redressability.  (ECF No. 71.)   WinRed argues that new facts emerged following the court's order on its first motion to dismiss "which show that WinRed is not the cause of [Mr. Labertew's] alleged harm and that the relief sought—injunctive relief against WinRed—will not redress [Mr. Labertew's] alleged harm."  (ECF No. 71 at 2.) Specifically, WinRed informed the court that between the parties' October 13, 2021 stipulation and December 5, 2022, "Mrs. B … attempted to contribute some 3,142 times … using known methods of payment and email addresses, each of which was blocked by WinRed."  (<u>Id.</u> at 3.) Further, between October 10 and 14, 2022, Mrs. B allegedly attempted to use new combinations of payment methods and email addresses to make 11 contributions through WinRed.  (<u>Id.</u>) WinRed argues that these facts demonstrate that Mrs. B—and not WinRed's direct or indirect donation solicitation methods—is to blame for her contributions on the platform.

WinRed separately filed a motion to stay this proceeding and compel arbitration (ECF No. 43), arguing that all of Mr. Labertew's remaining claims are "subject to WinRed's end user agreement, its 'Terms of Use,' because any contributions made through WinRed's platform require the contributor first to agree to the Terms of Use before making a contribution."  (<u>Id.</u> at 2.)  It cites to arbitration clauses in four online agreements (the Terms of Use), between users

4

(those who donated on WinRed's website between January 1, 2018, and October 7, 2021) and

"TS."[2]  (See Exs. A-1 to A-4 to Mot. to Compel Arbitration, ECF Nos. 43-1 to 43-4.)[3]  TS refers

to WinRed Technical Services, LLC, a limited liability company organized in Delaware on

February 27, 2019.  (Resp. in Opp'n to Mot. to Stay & Compel Arbitration, ECF No. 53 at 5.)

TS is separate and distinct from WinRed.  (Id.)  The arbitration clauses read: "You and TS agree

that any controversy or claim arising out of or relating to the Platform, use of the Platform, this

Agreement and/or the Privacy Policy … shall be settled by binding arbitration[.]"  (ECF

No. 43-1 at 4.)[4]  The term "Platform" refers to the website through which individuals like Mrs. B

donate money to political candidates and campaigns.

The agreements also state:

**BY AGREEING TO THE ARBITRATION OF DISPUTES … YOU AGREE
THAT YOU ARE WAIVING YOUR RIGHT TO A JURY TRIAL AND …
WAIV[E] YOUR RIGHTS TO … COURT ACTIONS.**

(Id.)  When users make contributions on WinRed's platform, they are required to click a

donation button accompanied by some close variation of the following disclaimer: "By clicking

'Donate' [I] accept WinRed's **terms of use**."  (ECF No. 56 at 9 (citation omitted).)  WinRed is

named as a third-party beneficiary in newer versions of its Terms of Use, those published on and

after February 26, 2020, but is not named in earlier versions of the terms.  (Compare "February

---

[2] WinRed asserts that Mrs. B affirmatively made some or all the contributions at issue during this period, which Mr. Labertew disputes.  (See Table of Contributions, Ex. B to Mot. to Stay & Compel Arbitration, ECF No. 43-5 at 2–14; Pl.'s Opp. Mot. Dismiss, ECF No. 76 at 4–5.)

[3] The cited Terms of Use became effective on the following dates: March 16, 2018, February 26, 2019, June 23, 2019, and February 26, 2020.  (See ECF Nos. 43-1–4.)

[4] Mr. Labertew does not dispute that, while the wording of the arbitration clause has changed slightly over time, the substance of the clause remains the same and is represented by Exhibit A-1 to the Motion to Stay and Compel Arbitration.  (ECF No. 43 at 2–3 n.1; see Resp. Mot. to Stay & Compel Arbitration, ECF No. 53.)

2020 Terms of Use," ECF No. 43-1, <u>with</u> "March 2018 Terms of Use," ECF No. 43-4, "February

2019 Terms of Use," ECF No. 43-2, <u>and</u> "June 2019 Terms of Use," ECF No. 43-3.)

Specifically, the final section of the February 2020 Terms of Use, labelled "Miscellaneous,"

states:

> These Terms constitute a binding agreement between you and TS, and is accepted
> by you upon your use of the Platform or your account.  These Terms constitute
> the entire agreement between you and TS regarding the use of the Platform and
> your account.  By using the Platform, you represent that you are capable of
> entering into a binding agreement, and that you agree to be bound by these Terms.
> <u>You acknowledge and agree that WinRed and the Indemnified Parties are</u>
> <u>intended third-party beneficiaries of these terms</u>.

(February 2020 Terms of Use at 13 (emphasis added).)  The final sentence indicating that

WinRed is an "intended third-party beneficiar[y]" is omitted from the March 2018, February

2019, and June 2019 Terms of Use.  (<u>See</u> ECF Nos. 43-2 to 43-4.)

In its motion to stay this proceeding and compel arbitration, WinRed argues that it may

invoke the arbitration agreement for claims arising out of each of Mrs. B's contributions on the

WinRed platform, even her contributions that precede the introduction of the February 2020

Terms of Use, when WinRed was first named a third-party beneficiary.  (ECF No. 43-2.)

## ANALYSIS

### I.    Motion to Dismiss for Lack of Subject Matter Jurisdiction

Before the court can decide WinRed's motion to stay and compel arbitration, the court

must determine whether it has subject matter jurisdiction over this case.  <u>See</u> <u>Steel Co. v.</u>

<u>Citizens for a Better Env't</u>, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot

proceed at all in any cause.").  WinRed argues that new facts require the court to reconsider its

order on WinRed's first motion to dismiss, where the court held that Mr. Labertew sufficiently

established standing to bring his claims against WinRed.  (ECF No. 37.)  Even considering these

6

new facts, the court again finds that Mr. Labertew has established standing to assert his claims against WinRed.

To establish standing, Mr. Labertew must satisfy three criteria. First, he must show that Mrs. B suffered a concrete and particularized "injury in fact." Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154–55 (10th Cir. 2005). Second, Mr. Labertew must show there is "a causal connection between that injury and the challenged action of the defendant—the injury must be 'fairly traceable' to the defendant, and not the result of the independent action of some third party." Id. at 1154. The "fairly traceable" element, a causation requirement, is "something less than the concept of 'proximate cause'" but still requires "proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact." Id. at 1156. Third, Mr. Labertew must demonstrate a substantial likelihood that "a favorable judgment will redress the injury." Id. at 1154.

WinRed contends that Mr. Labertew cannot establish the causation and redressability elements and again points to Mr. Lansing's Declaration—evidence far afield of the complaint—denying that WinRed "engage[s] in any direct solicitation or other telemarketing activities . . .". (Compare ECF No. 71 at 8 with ECF No. 27 at 21 (citing Lansing Decl. ¶¶ 5–7, 9).) WinRed also disputes redressability by labeling Mrs. B, not the Defendant, as the "source of Plaintiff's alleged harm." (ECF No. 71 at 3.) WinRed argues that after the parties entered the stipulation (ECF No. 23), Mrs. B "elude[d] WinRed's blocklist and successfully made 11 contributions through WinRed.com between October 10–14, 2022 [and] attempted to contribute some 3,142 times" after October 13, 2021, despite WinRed's alleged lack of contact or communication with Mrs. B. (ECF No. 71 at 3–4.)

WinRed's "'you've got the wrong party' … defense" must be considered under

7

Rule 12(b)(6).  Davis v. Wells Fargo, 824 F.3d 333, 348–49 (3d Cir. 2016) ("Rule 12(b)(6)—

with its attendant procedural and substantive protections for plaintiffs—is the proper vehicle for

the early testing of a plaintiff's claims").  And at the motion to dismiss stage, "the trial and

reviewing courts must accept as true all material allegations of the complaint, and must construe

the complaint in favor of the complaining party."  Therefore, at this stage, "the plaintiff's

'burden in establishing standing is lightened considerably.'"  Cressman v. Thompson, 719 F.3d

1139, 1144 (10th Cir. 2013) (quoting Petrella v. Brownback, 697 F.3d 1285, 1292 (10th Cir.

2012)).

     As with WinRed's first motion to dismiss, the second motion to dismiss fails because

WinRed's standing arguments implicate the merits of Mr. Labertew's claims, which are disputed

and rely on facts outside the bounds of the complaint.  The court again finds that Mr. Labertew

has adequately alleged causation and redressability.  Mr. Labertew has shown there is "a causal

connection between the injury and the conduct complained of[.]"  Cressman, 719 F.3d at 1145

(citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  For example, Mr. Labertew

alleges that:

- "[WinRed] conducts telephonic, internet, and telemarketing solicitations, as part of its political action business activities, in which it solicits contributions from those it contacts throughout the United States[.]"  (Compl. ¶ 12.)

- WinRed "has, for a number of years, preyed upon senior citizens and vulnerable adults, including Mrs. B, through persistent and repeated email, internet, electronic, text and other telephonic solicitations and telemarketing campaigns."  (Id. ¶ 13.)

- "Mrs. B was frequently contacted by Defendant, hounded by its employees and representatives … and then induced to contribute substantial sums of money to Defendant's political action committee."  (Id. ¶ 22.)

- "As part of its relentless campaign of abuse and exploitation, Defendant utilizes, and has employed, a deceptive recurring charge to targets' credit card accounts, by which Defendant automatically charges repeated contributions from those who agreed to make a single contribution."  (Id. ¶ 19.)

Notably, this last allegation suggests that WinRed could be liable for conversion or exploitation of a vulnerable adult even if it never contacted Mrs. B directly.  In any event, accepting the complaint's material allegations as true, the facts WinRed relies on in its motion (see ECF No. 71 at 2) do not change the court's determination that Mr. Labertew has sufficiently established causation.  There remain genuine, triable issues about how many of Mrs. B's donations were recurring charges, whether she was made aware of those recurring charges by WinRed, whether the pre-checked boxes mislead donors, and the extent of WinRed's direct or indirect relationship with telemarketers and solicitors of donations.  Indeed, a table submitted by WinRed that depicts details of Mrs. B's contributions over time further supports the complaint's allegations that some, if not many, of the charges to her credit cards were likely recurring charges by WinRed. (See Table of Contributions, Ex. B to Mot. to Stay & Compel Arbitration, ECF No. 43-5.) Specifically, the table shows that multiple donations were made at the exact same time, some of which, according to Mr. Labertew, bear IP addresses hailing not from Mrs. B's location, but from Virginia, where WinRed is based.  (Id.)  Further evidencing the plausibility of the complaint's allegations about recurring charges, as Mr. Labertew argues, the court finds it unlikely that Mrs. B would have personally attempted to direct donations at a rate of one contribution every other hour.  (See ECF No. 76 at 4–5.)

And on the issue of redressability, WinRed is incorrect to characterize Mr. Labertew's complaint as seeking only injunctive relief.  The complaint also addresses past conduct and seeks damages, attorney fees and costs, and other relief.  (See, e.g., Compl. ¶¶ 42–52.)  If WinRed is liable for conversion or exploitation of a vulnerable adult, as Mr. Labertew alleges, then an award of damages could redress some of Mr. Labertew's harm.  Mr. Labertew's complaint has

sufficiently established redressability.

For these reasons, Mr. Labertew has sufficiently pled standing.  The court can make this determination without ordering discovery on the issue of jurisdiction, an argument WinRed makes in the alternative in its motion to dismiss.  The court denies WinRed's second motion to dismiss.

## II.    Motion to Stay and Compel Arbitration

WinRed also moves to stay this case and compel arbitration of all Mr. Labertew's claims. Under the Federal Arbitration Act, an agreement to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Federal policy favors the enforceability of arbitration agreements.  See Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 91 (2000) (citation omitted).  However, "the right to arbitration, like any other contract right, can be waived."  Reid Burton Constr., Inc. v. Carpenters Dist. Council of S. Colo., 614 F.2d 698, 702 (10th Cir. 1980).  "The presumption in favor of arbitration is properly applied in interpreting the scope of an arbitration agreement; however, this presumption disappears when the parties dispute the existence of a valid arbitration agreement."  Dumais v. Am. Golf Corp., 299 F.3d 1216, 1220 (10th Cir. 2002).  "[T]he question whether parties have a valid arbitration agreement at all is a gateway matter that is presumptively for the courts to decide" on a motion to compel.  Bellman v. i3Carbon LLC, 563 F. App'x 608, 611 (10th Cir. 2014) (cleaned up).

"In deciding a motion to compel arbitration, courts use a framework similar to summary judgment practice" granting the motion "if there are no genuine issues of material fact regarding the [making of the] parties' agreement."  Graddy v. Carnegie Acad., LLC, No. 2:22-CV-00222-DBB-CMR, 2024 WL 642524, at *3 (D. Utah Feb. 15, 2024) (citing 9 U.S.C. § 4).  Courts

should give to the opposing party the benefit of all reasonable doubts and inferences that may arise." Id. When no material factual disputes exist, courts may decide the arbitration question as a matter of law. But "[w]hen parties dispute the making of an agreement to arbitrate, a jury trial on the existence of the agreement is warranted unless there are no genuine issues of material fact." Bellman, 563 F. App'x at 612 (citation omitted) (explaining that courts must proceed to trial "when factual disputes [seem likely to] determine whether the parties agreed to arbitrate); see also Howard v. Ferrellgas Partners, L.P., 748 F.3d 975, 978 (10th Cir. 2014) (similar).

## A. Waiver of Arbitration

Mr. Labertew argues that WinRed waived its right to demand arbitration by (1) filing a motion to dissolve the ex parte TRO; (2) stipulating to preliminary injunctive relief; (3) filing a motion to dismiss that challenged subject matter jurisdiction and the merits of Mr. Labertew's claims; (4) filing a joint attorney meeting planning report with a proposed scheduling order; and (5) attending hearings. (ECF No. 53 at 19-21.) Mr. Labertew also notes that WinRed did not assert a right to arbitration in its answer, failed to mention the arbitration clause in any of its previous pleadings or during hearings, and moved for an order compelling arbitration only after Mr. Labertew served interrogatories and document production requests on WinRed. (Id. at 4, 20.)

The Tenth Circuit considers the following factors when analyzing whether a party has waived its right to compel arbitration:

> (1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether the litigation machinery has been substantially invoked and the parties were well into preparation of a lawsuit before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in

11

arbitration] had taken place; and (6) whether the delay affected, misled, or prejudiced the opposing party.

Peterson v. Shearson/Am. Express, Inc., 849 F.2d 464, 467–68 (10th Cir. 1988) (cleaned up).

This list of factors is not exclusive, but rather acts as a guide, and courts should not apply the factors mechanically.  Hill v. Ricoh Americas Corp., 603 F.3d 766, 773 (10th Cir. 2010).  In fact, "[t]here is no set rule as to what constitutes a waiver or abandonment of the arbitration agreement; the question depends upon the facts of each case[.]"  Reid Burton Constr., 614 F.2d at 702.  But courts agree that a party should not be allowed "to take a mulligan if the court proceeding is progressing unfavorably or … to use the courts to obtain discovery unavailable in arbitration[.]"  603 F.3d at 774.  Courts do "not wish to encourage parties to attempt repeat litigation of merits issues not resolved to their satisfaction[.]"  Id. (citation omitted).  Nonetheless, "[a] party asserting a waiver of arbitration has a heavy burden of proof."  Peterson, 849 F.2d at 466.  Applying the Peterson factors, the court finds that WinRed has not waived its right to demand arbitration.  849 F.2d at 467–68.

On the one hand, as WinRed admits, some of WinRed's actions over the past year were inconsistent with an intent to arbitrate.  WinRed did not demand arbitration until about a year after Mr. Labertew filed his complaint.  (See Compl. dated Sept. 23, 2021; Mot. Compel dated Sept. 2, 2022, ECF No. 43.)  And during that time, WinRed filed motions to dissolve the ex parte TRO (ECF Nos. 13 & 18), negotiated preliminary injunctive relief (see ECF No. 23), filed a motion to dismiss (ECF No. 27), and participated in an attorney planning meeting (see ECF No. 39).  But, on balance, WinRed has not substantially invoked the litigation machinery or improperly manipulated the judicial process.  WinRed's involvement in discovery has been minimal.  WinRed filed its motion to compel arbitration around two months after the court entered the scheduling order and less than one month after Mr. Labertew served his first set of

interrogatories and document requests.  (Pl.'s Opp. Mot. Stay, ECF No. 53 at 4; Def.'s Reply to

Mot. to Stay & Compel Arbitration, ECF No. 56 at 17.)[5]  The court stayed all discovery pending

resolution of WinRed's motion to stay and compel arbitration.  (See Order dated Sept. 7, 2022,

ECF No. 45; see also Order dated Sept. 8, 2022, ECF No. 49.)

　　　　WinRed's motion practice has also been reasonable.  WinRed's motion to dissolve the

TRO is not problematic because WinRed had to respond to the court's ex parte TRO before the

case could begin in earnest, and "to defend itself, [d]efendant[] w[as] forced to litigate the

preliminary injunction in the forum of [p]laintiff's choosing."  Core Progression Franchise LLC

v. O'Hare, 2021 WL 6136183, at *6 (D. Colo. Dec. 29, 2021).  WinRed's next move—filing its

first motion to dismiss—challenged the court's subject matter jurisdiction and Mr. Labertew's

standing, without which the court would not be able to enforce an arbitration demand.  See

Vaden v. Discover Bank, 556 U.S. 49, 66 (2009) ("[A] party seeking to compel arbitration may

gain a federal court's assistance only if, save for the agreement, the entire, actual controversy

between the parties, as they have framed it, could be litigated in federal court") (cleaned up).

While WinRed did ask the court, in the alternative, to dismiss Mr. Labertew's claims for failure

to state a claim, this request is not necessarily inconsistent with an intent to arbitrate.  See, e.g.,

Hooper v. Advance Am. Cash Advance Ctrs. of Missouri, Inc., 589 F.3d 917, 922 (8th Cir. 2009)

("Not every motion to dismiss is inconsistent with the right to arbitration"), abrogated on other

grounds by In re Pawn Am. Consumer Data Breach Litig., 108 F.4th 610, 613 (8th Cir. 2024).

Nor is the passage of time alone a reason to find waiver.  Rather, the critical question is what was

---

[5] And, as WinRed notes, Mr. Labertew served his first written discovery requests on August 11, 2022, after he had already received notice of and conferred with WinRed on August 8, 2022, about WinRed's forthcoming motion to compel arbitration.  (ECF No. 56 at 17 (citing ECF No. 43 at 12).)

happening in litigation during that time.  Hill, 603 F.3d at 775.  A significant portion of the

case's first year was devoted, not to discovery, but to briefing on WinRed's motion to dismiss,

hearing arguments on the motion, and waiting for the court to issue an order on the motion.

Between the court's decision and the filing of WinRed's motion to stay and compel arbitration,

the parties agreed to a discovery schedule.  (See ECF Nos. 41 & 42.)

Given these circumstances, the question is less whether WinRed has "substantially

invoked the litigation machinery" but more whether WinRed's delay in filing the motion to stay

and compel arbitration has prejudiced Mr. Labertew.  The Peterson prejudice factor "refers to the

inherent unfairness—in terms of delay, expense, or damage to a party's legal position—that

occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that

same issue."[6]  In re Cox Enterprises, Inc. Set-top Cable Television Box Antitrust Litig. v. Cox

Comms., Inc., 835 F.3d 1195, 1208–09 (10th Cir. 2016) (citing Peterson, 849 F.2d at 467–68).

The prejudice must be substantial.  Hill, 603 F.3d at 775.

Mr. Labertew asserts that WinRed's September 2022 arbitration demand prejudiced

Mrs. B financially, and that, through WinRed's delay, "Mrs. B has incurred significant attorney

fees to defend against Defendant's various motions and tactics, discovery has been delayed and

postponed by Defendant's obstructionist litigation tactics, and Mrs. B's physical and mental

conditions continue to deteriorate."  (ECF No. 53 at 20.)  But he does not explain how WinRed's

litigation conduct and demand for arbitration has negatively affected his ability to litigate the

---

[6] Mr. Labertew argues that in Morgan v. Sundance, Inc., 596 U.S. 411, 416 (2022), the Supreme Court eliminated the requirement that a party resisting arbitration show prejudice in arguing waiver.  (See ECF No. 53 at 8.)  But Morgan reversed the precedent of nine circuits, not including the Tenth Circuit, that "support[ed] … an arbitration-specific waiver rule demanding a show of prejudice."  Id.  The Tenth Circuit, instead, views prejudice as a non-mandatory factor in the waiver analysis and continues to address that factor.  See Hill, 603 F.3d at 772–73.

merits of his elder abuse and conversion claims in either forum.  Nor does he explain how Mrs. B's continued deterioration interferes with his case.  Although Mrs. B incurred fees responding to WinRed's motions and drafting written discovery requests, that alone does not amount to prejudice.  As explained above, WinRed's actions did not manipulate the judicial process. Regardless of whether an enforceable arbitration agreement existed, a party who incurs fees in response to his opponent's reasonable defense, and whose desire to conduct immediate discovery is frustrated, is not prejudiced in the manner the Peterson factors contemplate (that is, by suffering "inherent unfairness").  See, e.g., PPG Indus., Inc. v. Webster Auto Parts, Inc., 128 F.3d 103, 107 (2d Cir. 1997) ("Incurring legal expenses inherent to litigation, without more, is insufficient to justify a finding of waiver.").  Mr. Labertew has not satisfied his burden.  See Hill, 603 F.3d at 775 ("The burden of persuasion lies with the party claiming that the right to demand arbitration has been waived.").  The court therefore finds that WinRed has not waived its right to demand arbitration at this stage in the case.

**B.  Existence of a Valid Agreement**

Mr. Labertew next argues that, even if the right to arbitration has not been waived, no arbitration agreement exists between Mrs. B and WinRed because 1) WinRed is not a party to the Terms of Use; 2) Mrs. B was not on notice of the Terms of Use; and (3) Mrs. B did not have capacity to assent to the agreement.

"Whether an agreement to arbitrate exists is simply a matter of contract between the parties."  Bellman, 563 F. App'x at 608 (citation omitted).  Accordingly, when deciding whether the parties agreed to arbitrate a certain matter, courts generally … should apply ordinary state-law principles that govern the formation of contracts.  First Options of Chicago, Inc. v. Kaplan,

514 U.S. 938, 944 (1995).  Under Utah law,[7] "[a]n enforceable contract thus consists of the terms

of a bargained-for exchange between the parties.  And the terms of the bargain are defined by the

meeting of the minds of the parties—through an offer and acceptance upon consideration."

Rossi v. Univ. of Utah, 496 P.3d 105, 112 (2021).  "An 'acceptance' is a manifestation of assent

to an offer, such that an objective, reasonable person is justified in understanding that a fully

enforceable contract has been made."  McKelvey v. Hamilton, 211 P.3d 390, 397 (Utah Ct. App.

2009).  To manifest assent, parties to a contract must be competent and capable to do so at the

time of the contract's execution.  Peterson v. Coca-Cola USA, 48 P.3d 941, 946 (Utah 2002)

(citing Anderson v. Brinkerhoff, 756 P.2d 95, 99–100 (Utah Ct. App. 1988)).  Competency is a

factual question to be decided by the trier of fact.  And if there are material facts in genuine

dispute regarding the making of the contract, including a party's competency, the court can

proceed to a summary trial to resolve the validity of an agreement to arbitrate.  Howard, 748 F.3d

at 984 ("when factual disputes may determine whether the parties agreed to arbitrate, the way to

resolve them . . . is by proceeding summarily to trial" because "[d]eciding whether a reasonable

person could find in your favor when looking at all the facts your way just isn't the same thing as

saying your story is the more credible one when viewed with the cool dispassion of a neutral

judge.")

     a.  **Third-Party Beneficiary**

     The court must first address whether WinRed is a party to all the Terms of Use Mrs. B

allegedly agreed to, and whether, as a third party, it can enforce any applicable arbitration

---

[7] While the Terms of Use provide that Delaware law applies, the parties have consented to the
application of Utah law.  (ECF No. 43 at 5–7; ECF No. 53 at 9–19; ECF No. 56 at 4–5, 9.)

provision.[8]  WinRed concedes it is not a direct party to any of the relevant Terms of Use, but it asserts third-party beneficiary rights to enforce the arbitration clauses against Mrs. B.  "For a third party to have enforceable rights under a contract, the intention of the contracting parties to confer a *separate and distinct benefit* upon the third party must be clear[.]"  SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assoc., Inc., 28 P.3d 669, 684 (Utah 2001).  If, at the time of contracting, the intent to make someone a third-party beneficiary is "clearly written or evidenced in the contract," then the presumption that the parties were only contracting for themselves is overcome and the named third-party beneficiaries receive the protections and obligations of arbitration.  Seaborn v. Larry H. Miller Mercedes Benz, No. 2:19-cv-941, 2020 WL 1550789, at *3–4 (D. Utah Apr. 1, 2020).

The February 2020 Terms of Use, effective February 26, 2020, clearly indicate that "WinRed … [is an] intended third-party beneficiar[y] of th[ose] terms[.]" (ECF No. 43-1 at 14.) This case is distinct from Cavlovic v. J.C. Penney Corp., Inc., which Mr. Labertew relies on, in which the court held that J.C. Penney lacked the power to compel arbitration under its credit card agreement.  884 F.3d 1051, 1058, 1060 (10th Cir. 2018).  That agreement included an arbitration provision directing: "If either you or we make a demand for arbitration, you and we must arbitrate any dispute or claim between you or any other user of your account, and us, our affiliates, agents and/or J.C. Penney Corporation, Inc. if it relates to your account . . .".  Id. at 1057.  The Tenth Circuit held that "you" referred to Cavlovic, and "we" referred to GE Capital Retail Bank, and not J.C. Penney.  Id.  Most importantly, the court also found that no other provision in the credit card agreement listed J.C. Penney as an intended third-party beneficiary.

---

[8] To resolve this discrepancy in contract language, the court ordered supplemental briefing on the following question: "What in those [earlier] agreements makes WinRed a third-party beneficiary of" those agreements?  (Order for Additional Briefing, ECF No. 63 at 1–2 (cleaned up).)

<u>Id.</u>  Here, by contrast, the February 2020 Terms of Use provide that "WinRed … [is an] intended third-party beneficiar[y] of these terms."  (ECF No. 43-1 at 14.)  Accordingly, as an expressly named third-party beneficiary, WinRed can enforce the rights and obligations created by the contract.

However, none of the earlier versions of the Terms of Use (dating back to January 2018, when Mrs. B's disputed donations began) include the third-party beneficiary language.  WinRed claims that the February 2020 Terms of Use "effectively displaced the earlier versions."  In other words, WinRed argues that these terms, namely, WinRed's ability to enforce the arbitration agreement as a third party, would apply to claims arising from any of Mrs. B's donations, including those she made or directed earlier than February 2020.  In support of this contention, WinRed relies on language in the earlier versions of the Terms of Use "expressly provid[ing] that Mrs. B would agree to 'any changes to these Terms' whenever Mrs. B made subsequent contributions on the WinRed platform."  (<u>Id.</u> (quoting ECF No. 43-1 at 3; ECF No. 43-2 at 2; ECF No. 43-3 at 2).)  Mr. Labertew initially agreed that "the operative agreement to arbitrate—if one had been created between the parties—would be the [February] 2020 Terms of Use."  (ECF No. 53 at 11–12 n.1.)  But in his supplemental brief on the third-party beneficiary issue, Mr. Labertew now argues that "there is nothing in the earlier agreements that makes WinRed a third-party beneficiary of the Terms of Use pre-dating the February 26, 2020 version."  (Resp. Brief Re: Third-Party Beneficiary, ECF No. 67 at 3.)  "While each of the versions indicates that revised terms will govern 'use' of the website 'after we post any changes,' none of the versions provides for retrospective application of the revisions to earlier transactions."  (<u>Id.</u> at 2.)  Mr. Labertew also argues that the February 2020 Terms of Use do not "clearly express[es] an intention 'to confer a separate and distinct benefit'" on WinRed regarding the arbitration clause.

ECF No. 67 at 8 (citing <u>Cavlovic</u>, 884 F.3d at 1058, 1060).

The court agrees with Mr. Labertew that the 2020 Terms of Use do not supersede all previous versions of the Terms of Use because there is no clause in the February 2020 Terms of Use that makes the February 2020 Terms of Use retroactive.  The language in the earlier terms simply provided that "from time to time we may update this Platform and these Terms.  Your use of this Platform after we post any changes to these Terms constitutes your agreement to those changes." (ECF No. 43-2 at 2; ECF No. 43-3 at 2.)[9]  While any new one-time contributions through the WinRed platform made after the Terms of Use were updated are governed by those subsequent terms, Mrs. B's earlier contributions remain subject to the Terms of Use in effect when those contributions were made.  Similarly, any recurring donations are governed by the Terms of Use in effect when those recurring donations were first set up.

The case on which WinRed primarily relies to support its position is distinguishable.  In <u>Ivy Bridge v. Nature's Sunshine Products, Inc.</u>, the plaintiffs were long-time consultants and distributors who worked for the defendant, Nature's Sunshine Products, Inc. (NSP).  No. 2:21-cv-495, 2022 U.S. Dist. LEXIS 36254, at *18 (D. Utah Mar. 1, 2022).  After the plaintiffs sued, NSP moved to compel arbitration, arguing that its relationship with each plaintiff was contractual and governed by three documents: a Consultant Application, a Compensation Plan, and NSP's Policies and Procedures, which contained an arbitration provision.  <u>Id.</u>, at *4.  The plaintiffs could "only participate in the Compensation Plan if they accept[ed] the NSP Policies, which

---

[9] The Terms of Use effective March 16, 2018, contains slightly changed language but is similar in all material respects.  (<u>See</u> ECF No. 43-4 at 2–3 ("We may revise and update these Terms from time to time in our sole discretion….  All changes are effective immediately when we post them, and apply to all access to and use of the Platform thereafter.  Your continued use of the Platform following the posting of revised Terms means that you accept and agree to the changes.").)

[were] posted on the NSP website and updated periodically, … agree[d] to be bound by any updates to the Policies, and … accept[ed] those updates each time they renew[ed] their membership, enroll[ed] a new member, or accept[ed] commissions or payments from NSP."  Id., at *13.  Because the plaintiffs, through continued employment and an "ongoing business relationship," had renewed their annual memberships, recruited new consultants, and accepted payments from NSP—thereby receiving a tangible benefit and fostering a mutually beneficial relationship that continued through each amendment to the Policies and Procedures—the court found that they were ultimately bound by the arbitration agreement included in subsequent versions of their employer's Policies and Procedures.  Id., at *18.  The court specifically noted the distinction between ongoing business relationships, such as employment, and "consumer cases."  The court explained that plaintiffs could not "avoid one provision of an agreement when they [were] taking advantage of the other provisions of that same agreement."  Id.  Accordingly, Ivy Bridge does not support the proposition that the February 2020 Terms of Use govern all contributions made by Mrs. B, even if Mrs. B agreed to those terms by making contributions after February 26, 2020.  Mrs. B did not receive any analogous benefit, employment or otherwise, by virtue of her continued donations to WinRed—this was a strictly consumer relationship in which she made donations for nothing in exchange.

WinRed also argues, without support, that WinRed was a third-party beneficiary under the earlier Terms of Use because its "name and logo were prominently displayed in the February 19, 2019 Terms and the June 23, 2019 Terms."  (ECF No. 68 at 7–8.)  But when determining whether an entity is a third-party beneficiary, Utah courts examine the benefits provided under the contract—not a logo affixed to a contract—to evaluate whether "[t]he written contract" shows clear "inten[t] to confer a separate and distinct benefit upon the third party."  Gulf Coast

<u>Shippers Ltd. P'ship v. DHL Exp. (USA), Inc.</u>, No. 2:09-cv-221, 2015 WL 4557573, at *13 (D. Utah July 28, 2015).  A logo is insufficient to convey the parties' express intent to confer a separate and distinct benefit upon WinRed.

Finally, the court disagrees with Winred that Mr. Labertew should be estopped from arguing that the earlier Terms of Use do not confer third-party beneficiary status on WinRed. (<u>See</u> Reply Mem. in Resp. to Order for Suppl. Br., ECF No. 68 at 7 ("[Mr. Labertew's] sudden about face on that issue is without justification and appears to be out of pure convenience.").) While Mr. Labertew originally agreed that if the parties formed an agreement, the operative agreement would be the February 2020 Terms of Use (<u>see</u> ECF No. 53 at 11–12 n.1), WinRed has not shown that Mr. Labertew's inconsistent legal position "places [WinRed] … at a disadvantage."  <u>Penny v. Giuffrida</u>, 897 F.2d 1543, 1545 (10th Cir. 1990).

In sum, although WinRed is not a third-party beneficiary of the Terms of Use predating February 26, 2020, WinRed is a third-party beneficiary of the February 2020 (and subsequent) Terms of Use.  As a result, only Mr. Labertew's claims related to Mrs. B's contributions made on or after February 26, 2020 (as many as 645 out of 722 contributions (<u>see</u> ECF No. 43-5 at 3–14)) are subject to mandatory arbitration.[10]  The contributions Mrs. B made or directed be made before that date (at least 77, <u>see</u> <u>id.</u> at 2–3) are not covered by any arbitration agreement that is enforceable by WinRed.

    **b.  Notice**

Mr. Labertew argues that Mrs. B was not on notice of an agreement to arbitrate claims against WinRed, and therefore cannot be bound, based on (1) the format of WinRed's online donation portal and its terms of use, including the arbitration provision; and (2) the fact that

---

[10] The court will discuss these figures in more detail below.

some portion of Mrs. B's donations were made as recurring charges, rather than new donations requiring affirmative agreement to WinRed's Terms of Use.  (ECF No. 53 at 14–15.)

WinRed submitted four exhibits to the court to support its argument that Mrs. B had adequate notice.  The first is a table showing Mrs. B's contributions on the WinRed platform from January 1, 2018, to October 7, 2021.  (See Table of Contributions; see also Decl. Gerrit Lansing, Ex. C to Mot. to Stay & Compel Arbitration, ECF No. 43-6 at ¶¶ 4–6.)  The table lists 722 donations through the platform by Mrs. B between January 1, 2018 and October 7, 2021.  (See ECF Nos. 43-5 & 43-6.)  For each donation, WinRed includes the date of the contribution, the time at which Mrs. B accepted the Terms of Use for each donation, and the corresponding internet-protocol (IP) address for the device from which the contribution was made.[11]  (Id.)  WinRed has not specified which of Mrs. B's 722 donations were recurring versus one-time donations, but its President represented—without evidence to support this claim—that over 90% of the donations made by Mrs. B through WinRed were via single, one-time donations, rather than recurring donations.  (ECF No. 5 at ¶ 14.)  WinRed also submitted three "contribution webpage examples" showing how WinRed's donation page appears to users.  (See ECF Nos. 56-1 to 56-3.)  WinRed argues that Mrs. B agreed to the updated Terms of Use because the donation button was accompanied by some close variation of the following disclaimer: "By clicking 'Donate' I accept WinRed's **terms of use** and **privacy policy**."  (ECF No. 56 at 9 (citation omitted) (emphasis in original).)

Online adhesion contracts, such as the Terms of Use, can raise notice issues and may be categorized as "clickwrap" or "browsewrap."  A clickwrap agreement requires an online user to

---

[11] An IP address is a 10-digit identification tag for computers and phones identifying their visitation to a specific website.  See Internet-Protocol Address, Black's Law Dictionary (12th ed. 2024).

affirmatively click on a button or check a box stating that the user agrees to terms.  Meyer v.

Uber Tech., Inc., 868 F.3d 66, 75 (2d Cir. 2017).  Courts routinely uphold clickwrap agreements

due to the user's need to affirmatively "click."  See, e.g., Hancock v. AT&T, Inc., 701 F.3d

1248, 1256 (10th Cir. 2012).  Clickwrap agreements "have been found valid even where the

party was required to click on a link to view the terms of the agreement."  Anderson v.

Amazon.com, Inc., 490 F. Supp. 3d 1265, 1275 (M.D. Tenn. 2020).  A browsewrap agreement,

by contrast, provides minimal notice because it does not require the user to affirmatively accept

the contractual terms, for instance by clicking on an "I agree" button.  Instead, the website

simply states that certain terms and conditions apply and directs the user's attention to a

hyperlink, which links to the terms and conditions in a separate page or pop-up window.  Meyer,

868 F.3d at 75.  "Because no affirmative action is required, … the validity of the browsewrap

contract depends on whether the user has actual or constructive knowledge of a website's terms

and conditions."  Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1176 (9th Cir. 2014) (citation

and quotation marks omitted).

Courts typically categorize agreements containing features of both clickwrap and

browsewrap as "hybrid clickwrap/browsewrap agreements" and uphold them.  See, e.g.,

Anderson, 490 F. Supp. 3d at 1268–69, 1275.  In Anderson, the plaintiff purchased two seat belt

extenders online.  Id. at 1268.  After adding the items to his shopping cart, the plaintiff clicked a

"Check Out" button, selected delivery, and then clicked a "Review Your Order button."  Id. at

1269.  The "Review Your Order" page included a "Place Order" button accompanied by a

disclaimer stating: "By clicking Place Order, you agree to Walmart's Updated **Privacy Policy**

and **Terms of Use**[.]"  Id.  The customer's order could not be completed without clicking "Place

Order."  Id.  The court rejected the plaintiff's argument that this was a pure browsewrap

23

agreement, as the "Terms of Use were not hidden from the consumer, and they required assent and confrontation by the user." Id. at 1276. "The hyperlink was prominently displayed directly above the 'Place Order' button" and "[w]ith just the single click of a mouse before placing his order, Plaintiff … would have been able to access the Terms of Use, as well as the Arbitration Clause." Id. at 1275. The court held that "regardless of whether the agreement constitute[d] clickwrap or hybrid clickwrap/browsewrap, the agreement is of the type that has regularly been upheld by courts." Id. at 1276 (citing cases). "[C]ourts have held that a modified or hybrid clickwrap/browsewrap agreement constitutes a binding contract where the user is provided with an opportunity to review the terms of service in the form of a hyperlink immediately under the 'I accept' button and clicks that button." Crawford v. Beachbody, LLC, 2014 WL 6606563, at *3 (S.D. Cal. Nov. 5, 2014); see also Fteja v. Facebook, Inc., 841 F. Supp. 2d 829, 838 (S.D.N.Y. 2012) (upholding Facebook's Terms of Use after finding that they were "visible via a hyperlink" and bore features of "a clickwrap agreement in that the user must do something else—click 'Sign Up'—to assent to the hyperlinked terms").

WinRed asserts that its Terms of Use agreement is clickwrap, while Mr. Labertew characterizes it as browsewrap. The court finds that the agreement is a routinely enforced hybrid clickwrap/browsewrap, which provides donors with sufficient notice of the arbitration agreement at issue. To make a one-time donation or set up recurring payments on the WinRed platform, users must click the "Donate" button to finalize their transaction. (See ECF Nos. 56-1 to 56-3.) Like in Anderson, just below the "Donate" button is a disclaimer that statess: "By clicking 'Donate' I accept WinRed's **terms of use** and **privacy policy**." (Id. (emphasis in original).) Users therefore may not contribute without affirmatively clicking a button showing their assent to the accompanying underlined and hyperlinked Terms of Use. While WinRed's hyperlinked

24

disclaimers are not written in blue font and do not require review of the terms or checking a separate box saying "I agree," the visibility of the disclaimer, the underlined hyperlink, its proximity to the "Donate" button, and the incorporation of the Terms of Use to each donation page allow reasonable users to know that by contributing to the WinRed platform, they are bound by WinRed's Terms of Use.  WinRed's Terms of Use were not only visible to the user, see Anderson, 490 F. Supp. 3d at 1275, but the donations pages "clearly incorporated the" Terms of Use.  Magid Glove & Mfg. Safety Co., LLC v. Tower Int'l, Inc., 2011 WL 1118883, at *3 (N.D. Ill. Mar. 25, 2011).  As a result of these clearly visible and accessible Terms of Use, Mrs. B would have "actual or constructive notice of the terms, sufficient to demonstrate [her] mutual assent to its conditions," including the arbitration provision.  My Daily Choice, Inc. v. Butler, 2021 WL 3475547, at *6 (D. Nev. Aug. 6, 2021).

Mr. Labertew also argues that Mrs. B could not be on notice of the arbitration agreement because he maintains that at least some of donations charged to her credit cards after February 2020 were recurring charge donations that she committed to making before the February 2020 Terms of Use were introduced.  In other words, he disputes that Mrs. B made all 722 or so of her WinRed contributions by clicking the "Donate" button and affirmatively accepting the updated Terms of Use.  (Id. at 11.)  In support of his argument that some of Mrs. B's contributions after February 2020 were recurring, Mr. Labertew emphasizes that "many IP addresses contained in the [WinRed] table" post-dating the February 2020 Terms of Use "point to Virginia as the location of the IP address, rather than Mrs. B's home in Utah."  (ECF No. 53 at 10–11.)  WinRed offers an alternative theory that these contributions were simply one-time donations from Mrs. B that went through WinRed's federal PAC account located in Virginia and were then distributed to a recipient political committee from a Virginia IP address.  (ECF No. 56 at 10 n.8.)

The court finds, for the reasons discussed above, that to the extent that Mrs. B

affirmatively clicked the "Donate" button on or after February 26, 2020, she would be "on

notice" of the Terms of Use, including the arbitration agreement to which WinRed is named a

third-party beneficiary.  But in instances where Mrs. B did not affirmatively click the "Donate"

button—because such payment was a recurring charge set up under an earlier iteration of the

Terms of Use—then Mrs. B would not have received the hyperlinked notice of the platform's

updated Terms of Use, including WinRed's status as a third-party beneficiary to the arbitration

provision.  And although Mrs. B might have been aware that recurring donations could be

charged under new Terms of Use, accepting the facts alleged in the complaint as true, WinRed's

platform deceives contributors by concealing its recurring charge feature and making it difficult

to opt out.  (Compl. ¶¶ 19, 24, 31.)  This means that Mrs. B, in at least some instances after the

introduction of February 2020 Terms of Use, might not have received notice that she had even

agreed to donate in the future.  The court has insufficient evidence at this juncture to determine

which of Mrs. B's contributions after February 2020 were recurring contributions stemming

from donations made before February 26, 2020, and which were one-time payments.[12]

---

[12] WinRed represents that 11% of Mrs. B's 722 contributions were made prior to the introduction
of the February 2020 Terms of Use, while 89% of her contributions (646 transactions) were
made after the February 2020 Terms of Use.  (See ECF Nos. 43-5; 43-6.)  But WinRed has not
clarified how many of the 646 transactions post-dating the February 2020 Terms of Use were
recurring contributions, as opposed to one-time donations.  Nor has WinRed indicated how many
of the recurring payments post-dating the February 2020 terms (to the extent there are any) relate
back to an initial contribution date that precedes the February 2020 Terms of Use.  Mr. Labertew
argues that the Virginia IP addresses on some of Mrs. B's donations post-dating the February
2020 Terms of Use indicate that such charges were recurring charges, and not one-time
donations. While Defendant offers a plausible alternative explanation for the Virginia IP
addresses, this issue demands discovery. Indeed, the court notes that several of Mrs. B's
donations post-dating the February 2020 Terms of Use appear to have been made at the exact
same time (down to the second) and from the same IP Address, which suggest that these
contributions were recurring payments tied to earlier-in-time donations. (See, e.g., ECF No.
43-5.)

Accordingly, there are genuine issues of material fact on the issues of recurring charges and the extent of Mrs. B's notice as to the February 2020 Terms of Use.  The court will address this issue at the summary proceeding.

### c.   Incapacity

Finally, Mr. Labertew contends that even if arbitration is required for claims arising from some or all of Mrs. B's contributions, the arbitration agreement is invalid because Mrs. B lacked the mental capacity between 2018 and the present to assent to the different iterations of the Terms of Use.  (ECF No. 53 at 18–19.)  Material questions of fact regarding a contracting party's mental capacity implicate the arbitrability of a dispute, despite an otherwise enforceable arbitration clause.  Spahr v. Secco, 330 F.3d 1266, 1273 (10th Cir. 2003).  When a "quick look at the case suggests material issues of fact do exist on the question" of the making of the arbitration agreement, then the Federal Arbitration Act "calls for a summary trial" with discovery, wherein evidence on the motion may be received by the Court.  Howard, 748 F.3d at 978 (finding district court erred in denying request for evidentiary hearing on validity of arbitration agreement).  Accordingly, the Court must decide whether, based on a "quick look at the case," a low evidentiary burden at this stage, Mrs. B's capacity to contract in February 2020 is a genuine issue of fact.  Id.  If so, a summary evidentiary hearing is required for a merits resolution.  Id.

Mr. Labertew's incapacity defense to the arbitration agreement relies on his well-pled allegations that Mrs. P suffers and suffered from "severe memory loss, poor executive functioning skills, [and] advanced dementia" and required "home care assistance" seven days a week for 24 hours a day.  (Compl. ¶¶ 2, 7, 11.)  He also presents evidence, a declaration from Dr. Michael Kagen, M.D., Mrs. B's treating physician, which he argues is either expert or lay witness testimony of Mrs. B's incompetence.  (Decl. Michael Kagen, Ex. 1 to Pl.'s Resp. in

Opp'n to Mot. to Stay & Compel Arbitration, ECF No. 53-1.)  In his declaration, Dr. Kagen testifies that he has treated Mrs. B since March 2020, and that, since 2017, Mrs. B had a shunt in her brain and has suffered and continues to suffer from neurodegenerative disease.  (Id. ¶¶ 7–10.) Dr. Kagen also testifies that her cognitive deficits substantially limit her ability to care for herself, manage her financial resources, and understand the consequences of her actions.  (Id. ¶¶ 7–20.)  Dr. Kagen confirmed the Complaint's allegations that, as a result of these issues, Mrs. B receives and requires 24/7 home care.  (Id.)  WinRed counters that Mrs. B must have had the mental capacity to contract based on her access to a phone or computer, her opening and use of multiple credit cards, her donation attempts, and her purchase of gold and shares in a private jet. (ECF No. 56 at 13-14.)  WinRed further argues that the court should exclude from its consideration Dr. Kagan's Declaration under Rule 702 of the Federal Rules of Evidence and Rules 26 and 56 of the Federal Rules of Civil Procedure.[13]  ECF No. 72.

The court concludes that the Complaint's allegations regarding Mrs. B's mental state in February 2020 and her need for 24/7 home care prior to and since that period due to her inability to care for herself are sufficient on their own at this stage of the proceeding to raise an issue of fact necessitating discovery and an evidentiary hearing as to whether Mrs. B had the capacity from late February 2020 onwards to understand the subject and consequences of WinRed's Terms of Use.  The relevant factual issue to address for a competency dispute is not whether an individual had the capacity to sign an agreement, direct a payment, or access a phone or computer (see ECF No. 14), but whether "an individual's 'mental facilities [were] so deficient or impaired that there was not sufficient power to comprehend the subject of the contract, its nature

---

[13] WinRed also objects that Dr. Kagen's declaration was submitted unsigned, but Mr. Labertew has since cured that issue.  (See Not. Errata Kagen Decl., ECF No. 57.)

and its probable consequences, and to act with discretion in relation thereto, or with relation to the ordinary affairs of life." Wittingham, LLC v. TNE Ltd. P'ship, 469 P.3d 1035, 1051 (Utah 2020) (citing Peterson, 48 P.3d at 946). WinRed's arguments, presented without expert or lay witness testimony in support, that Mrs. B must have had the capacity to contract because she has a smartphone or computer and has allegedly used it to open new credit cards and make various purchases and donations, is not compelling evidence that she can independently, without impairment, engage in the ordinary affairs of life and/or understand the consequences of her actions. Indeed, were evidence of engaging in financial transactions sufficient to conclusively resolve factual disputes as to a contracting party's capacity, then the simple fact that a party had attempted to sign or successfully signed a contract would always, on its own, moot the incapacity defense—an outcome plainly inconsistent with the law.

Bolstering the details of Mrs. B's mental state alleged in the Complaint, the court notes that Mrs. B's donation patterns raise commonsense red flags about Mrs. B's state of mind from 2019 onwards. For example, Mr. Labertew alleges that records will show Mrs. B made 11 separate and relatively small contributions to "McCarthy for Congress" on May 26, 2021; 16 contributions to "Marco Rubio" on June 1, 2021; 12 contributions to "Marco Rubio" on June 15, 2021; 17 small contributions to "Mike Pompeo" on July 13, 2021; and 27 contributions to "NRSC" on August 16, 2021. (See Compl. ¶ 24.) While the alleged donation dates differ in some instances from the donation dates supplied by WinRed in its Table of Contributions (compare Compl. ¶ 24 with ECF No. 43-5), the donation records in WinRed's Table of Contributions demonstrate similarly erratic contribution patterns from 2019 to 2021. (See, e.g., Table of Contributions at 2-8 (11 donations to the National Republican Congressional Committee, on August 28, 2019; 7 donations to "Mitch McConnell" on January 30, 2020; 14

donations to "Steve Daines" on July 25, 2020; 21 donations to "Mike Lee" on May 27, 2021; and 16 contributions to "Marco Rubio for Senate" on June 1, 2021).) Further, WinRed alleges in its second motion to dismiss that Mrs. B attempted to contribute some 3,142 times between October 13, 2021 and December 5, 2022, each of which was blocked by WinRed pursuant to the Stipulation. (See ECF No. 69-1 at ¶¶ 6, 76 at 4–5.) As Mr. Labertew notes, this comes out to a rate of one blocked contribution every other hour. (Id.) While it is unclear how many of Mrs. B's failed donations were to the same candidate or cause, and if some of these individual transactions were recurring donations, the sheer number of donations in the face of a firewall indicates some level of mental dissociation. While the court notes the important principle of freedom of contract, commonsense dictates that competent individuals would opt to make fewer lump-sum donations to a given candidate or cause, rather than going through the donation portal up to 27 times per day per recipient, and would give up on their attempt to donate after thousands of donations were blocked.

Viewing the facts and reasonable inferences in the nonmoving party's favor, Mrs. B's erratic behavior coupled with credible allegations that Mrs. B required, during the February 2020 events in question, around-the-clock home care and legal guardianship, without any expert analysis or lay witness testimony to the contrary, is sufficient to raise a genuine factual issue about whether Mrs. B could, at the time of her contributions, handle and understand the consequences of the "ordinary affairs of life." Wittingham, LLC, 469 P.3d at 1051; see also Mitchell v. Wells Fargo Bank, 280 F. Supp. 3d 1261, 1283 (D. Utah 2017) (holding that, in light of the allegations, "at this stage …. the court cannot find a valid arbitration agreement was entered"); Gonzales v. Brinker Int'l Payroll Co., LP, 2016 WL 9777204, at *2 (D.N.M. June 17, 2016) (because "[t]his case presents the classic party 1 said versus party 2 said scenario," the

arbitrability of this dispute "can only be resolved by the judicial fact finding process of a trial").[14]  The court further notes that the evidentiary record concerning Mrs. B's capacity is bare. There has been no material arbitration-related discovery.  Mr. Labertew has submitted only one declaration from Mrs. B's treating physician, and there have been no depositions on the issue. Accordingly, the parties have not yet been afforded an opportunity to sufficiently develop the record on this issue.  E.g., Dalon v. Ruleville Nursing & Rehab. Ctr., LLC, 161 F. Supp. 3d 406, 418 (N.D. Miss. 2016) (hearing required where evidentiary record was "far from develop[ed]" with "only one affidavit" and no depositions); Interbras Cayman Co. v. Orient Victory Shipping Co., S.A., 663 F.2d 4, 5 (2d Cir. 1981) (hearing required where record consisted only of affidavits).

Although the court finds that Mr. Labertew has raised genuine issues of material fact regarding Mrs. B's mental capacity even without relying on Dr. Kagen's declaration, the court addresses WinRed's objections to that declaration.  The court agrees with WinRed that portions of Dr. Kagen's testimony must be characterized as unsupported and unreliable "expert" testimony, and are therefore inadmissible under Rule 702 of the Federal Rules of Evidence, which applies to "scientific, technical, or other specialized knowledge."  Specifically, where Dr. Kagen makes conclusions about Mrs. B's capacity to contract, he glaringly omits his methods of analysis—such as the specific medical records or facts analyzed, his methodology for analyzing data, or any cognitive tests he performed.  (See Kagen Decl. ¶¶ 11–20.)  As a result of these deficiencies, this portion of Dr. Kagen's testimony is inadmissible.  See Kumho Tire Co., Ltd. v.

---

[14] It is worth noting that the court's finding that there are genuine factual disputes as to Mrs. B's mental competency is consistent with the court's prior grants of two separate TROs, wherein the court held hearings and examined evidence and determined that Mr. Labertew had established a substantial likelihood of succeed on the merits on his claims, including for exploitation of a "vulnerable" adult.  (TRO at 2; Second TRO at 1.)

Carmichael, 526 U.S. 137, 141 (1999) (trial courts must be assured that an expert's conclusions "rest[] on a reliable foundation" and that the expert obtain[ed] "sufficient facts and data in order to reach" his conclusions) (citing Fed. R. Evid. 702); United States v. Crabbe, 556 F. Supp. 2d 1217, 1227 (D. Colo. 2008) (similar).

But the court finds that aspects of Dr. Kagen's declaration are nonetheless admissible as persuasive lay witness testimony.  The Tenth Circuit recognizes that Rule 701 allows lay witnesses to offer "observations [that] are common enough and require . . . a limited amount of expertise, if any" and that the "prototypical example of the type of evidence contemplated by the adoption of Rule 701 relates to the … competency of a person," among other factual inferences. James River Ins. Co. v. Rapid Funding, LLC, 658 F.3d 1207, 1214 (10th Cir. 2011) (citing Asplundh Mfg. Div. v. Benton Harbor Eng., 57 F.3d 1190, 1196 (3d Cir.1995)).  More specifically, the Tenth Circuit has held that a treating physician's testimony about their patient may constitute lay witness, not expert, testimony, even though practicing medicine is a scientific profession.  E.g., United States v. Powers, 578 F. App'x 763, 775 (10th Cir. 2014) ("Although the Tenth Circuit has not defined the bounds of permissible testimony for a treating physician as a lay witness, it seems that it is permissible for a treating physician to provide testimony about the treatment of the physician's patients") (citation omitted); Parker v. Cent. Kansas Med. Ctr., 57 F. App'x 401, 404 (10th Cir. 2003) (holding that treating physician's testimony about the scope of treatment is not expert testimony); Davoll v. Webb, 194 F.3d 1116, 1138–39 (10th Cir. 1999) (a "treating physician is not considered an expert witness if he or she testifies about observations based on personal knowledge, including the treatment of the party" and may, as a lay witness, "state 'expert' facts . . . to explain his testimony" and use "medical terminology").  Dr. Kagen's declaration, in part, sets out his personal knowledge of his patient's treatment and

her medical records in the relevant time period: specifically, that Mrs. B has a 40-year history of

alcoholism, suffers from neurodegeneration, and has had a shunt in her brain since December

2017, and that such issues have caused observable cognitive deficits since at least the time when

Dr. Kagen began his treatment.  (Kagen Decl. ¶¶ 7–10.)  These are lay witness factual

observations, albeit from a medical doctor, that do not require him to elaborate on his scientific

methods, and therefore do not pose a risk of undermining the reliability requirements for Rule

702.  And Dr. Kagen's personal knowledge of Mrs. B's mental capacity aligns with the relevant

time frame to this issue: the introduction and continued employment of the February 2020 Terms

of Use and accompanying arbitration agreement. [15]   Indeed, Dr. Kagen outlines his treatment of

Mrs. B since March 2020—just weeks after she allegedly agreed to the February 2020 Terms of

Use.  (Kagen Decl. ¶¶ 5-7.)  Dr. Kagen's unrebutted lay witness testimony further supports the

court's need for a summary hearing as to Mrs. B's mental capacity in February 2020 onwards.

        Given these issues of fact about Mrs. B's mental competency, the court denies WinRed's

motion to compel arbitration but grants WinRed leave to renew its motion after the court has

held a summary proceeding.  See Howard, 748 F.3d at 978; see also Brent v. Priority 1 Auto.

Grp., BMW of Rockville, 98 F. Supp. 3d 833, 838–39 (D. Md. 2015) (because of issues of fact

regarding signature to contract, "case w[ould] proceed with discovery on the validity of the

Arbitration Agreement" with "a jury trial to determine this discrete matter of fact"); Gudge v.

109 Rest. Corp., 118 F. Supp. 3d 543, 547–48 (E.D.N.Y. Aug. 6, 2015) ("Defendants' motion to

compel arbitration is denied, without prejudice to renew following a hearing on whether the

---

[15], Defendant's argument that Dr. Kagen is not knowledgeable because he "admits to only caring
for Mrs. B since March 2020" (ECF No. 56 at 13) is mooted by the court's holding that the
enforceability issue concerns Mrs. B's ability to understand and assent to Terms of Use on and
after February 26, 2020.

parties agreed to arbitrate and specifically whether Plaintiff signed a lease agreement."); <u>Dalon</u>, 161 F. Supp. 3d at 418 (holding that "genuine issues of material fact relating to the making of the agreement, including the degree of [signator's] mental impairment and confusion at the time of admission" required an evidentiary hearing).

### C.  Scope of Arbitration Clause

The court must next consider whether Mrs. B's complaint falls within the scope of the arbitration clause, in the event the agreement is found viable.  <u>See</u> <u>Cavlovic</u>, 884 F.3d at 1059. "Where an arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview.  Where the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered[.]"  <u>Cummings v. FedEx Ground Package Sys., Inc.</u>, 404 F.3d 1258, 1261 (10th Cir. 2005) (citations omitted).

The arbitration clauses at issue direct that "any controversy or claim arising out of or relating to the [WinRed] Platform, [or] use of the Platform … shall be settled by binding arbitration."  (ECF No. 43-1 at 4.)  Mr. Labertew's concedes that "the scope of the arbitration clause is broad[,]" at least in terms of its subject matter.  (<u>See</u> ECF No. 67 at 6.)  The court agrees and finds that Mr. Labertew's claims for conversion and exploitation of a vulnerable adult fall within the scope of the agreement's arbitration clause to the extent they relate to Mrs. B's contributions post-dating the introduction of the February 2020 Terms (excluding any recurring payments beyond February 26, 2020 that were initiated prior to the February 2020 Terms).  (<u>See</u> <u>generally</u> ECF No. 53.)  The summary proceeding will address which of Mrs. B's contributions are governed by the arbitration agreement.

### D.  Stay of Litigation Pending Arbitration

If the summary proceeding demonstrates that Mrs. B had the capacity to assent to the

Terms of Use and accompanying arbitration agreement, the court must decide whether to stay or continue this litigation regarding claims arising from Mrs. B's contributions made or directed prior to February 26, 2020, which are not covered by the arbitration agreement.

"The Arbitration Act requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel" despite the "possibly inefficient maintenance of separate proceedings in different forums[.]" <u>Dean Witter Reynolds, Inc. v. Byrd</u>, 470 U.S. 213, 218 (1985). "Courts have discretion on whether to stay an action pending arbitration." <u>Franklin Templeton Bank & Tr. v. Butler</u>, No. 2:15-CV-435-JNP-EJF, 2016 WL 3129141, at *5 (D. Utah June 2, 2016) (citing <u>Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1, 20 n.23 (1983)). In some instances, "courts have held that arbitration should proceed in tandem with non-arbitrable litigation." <u>Coors Brewing Co. v. Molson Breweries</u>, 51 F.3d 1511, 1518 (10th Cir. 1995) (holding that arbitration and litigation should proceed in parallel). Factors that courts consider in evaluating the necessity of a stay where a separate, related proceeding (either arbitration or litigation) is already pending "include whether a stay would (1) 'promote judicial economy;' (2) 'avoid confusion and inconsistent results;' and (3) 'unduly prejudice the parties or create undue hardship.' <u>Franklin</u>, 2016 WL 3129141, at *4 (citing <u>UBS Bank USA v. Hawit</u>, No. 2:09-cv-32-DAK, 2009 WL 2366046, at *2 (D. Utah July 31, 2009)). Where, as here, a secondary but related proceeding is not yet pending, this court has explained that "the right to proceed in court should not be denied except under the most extreme circumstances" and that, accordingly, "the movant seeking a stay must make a strong showing of necessity." <u>Classic Aviation Holdings LLC v. Harrower</u>, No. 2:20-cv-00824-RJS-JCB, 2021 WL 633587, at *2 (D. Utah Feb. 18, 2021) (quotations omitted). Although the court has the broad authority to grant a stay pending the outcome of an arbitration, the party requesting the

stay bears the burden of proving that a stay is warranted.  See Franklin, 2016 WL 3129141, at *4.

The party seeking a stay "therefore generally faces a difficult burden.'"  Classic Aviation, 2021

WL 633587, at *2.

Here, WinRed has cited no authority supporting its argument that a stay is warranted, let

alone necessary due to any "extreme circumstances."  (See ECF No. 68 at 4.)  Indeed, WinRed

has not argued prejudice or a risk of inconsistent outcomes, nor did it provide support for its

"judicial economy" argument.  (Id.)  WinRed had the full and fair opportunity to demand a stay

and failed to meet its burden.  See, e.g., Classic Aviation Holdings LLC, 2021 WL 633587, at

*2; Franklin, 2016 WL 3129141, at *4.  Accordingly, the court finds no reason to stay this

litigation pending arbitration, and therefore denies WinRed's motion for a stay.

*      *      *

In sum, WinRed did not waive its right to demand arbitration.  While Mrs. B was or

should have been on notice of the arbitration agreement when making one-time contributions on

or after February 26, 2020, there are material questions of fact requiring summary proceedings

about whether (a) Mrs. B had the capacity to enter a valid agreement to arbitrate; and (b) how

many of Mrs. B's contributions were made or directed to be made prior to February 26, 2020.  If

a summary proceeding finds Mrs. B competent to agree to the February 2020 Terms of Use, then

Defendant may renew its motion to compel arbitration regarding any one-time donations made

after February 26, 2020.  Should Mr. Labertew continue to pursue his non-arbitrable claims

related to one-time or recurring contributions made before February 26, 2020, the court finds no

reason to stay this action.

## ORDER

The case will allow discovery of a limited scope followed by a summary proceeding to

determine two issues: first, Mrs. B's capacity from February 2020 onwards to agree to the Terms

36

of Use; and second, if the February 2020 Terms of Use agreement is enforceable, which of

Mrs. B's contributions to WinRed are governed by that agreement.  If, after the summary

proceeding, the court finds that the arbitration agreement is enforceable, the court grants WinRed

leave to renew its motion to stay and compel arbitration for claims concerning contributions

governed by the February 2020 Terms of Use.

For the foregoing reasons, the court ORDERS as follows:

1.      The court DENIES WinRed's second motion to dismiss (ECF No. 71.)

2.      The court DENIES WinRed's motion to stay and compel arbitration (ECF

No. 43.)  The court will grant WinRed leave to renew its motion after the summary proceeding if

the court finds the February 2020 Terms of Use agreement is enforceable.

3.      The court sets a status conference on October 16, 2024 at 10:30 AM to discuss the

timing for the summary trial and procedures.  To comply with Section 4 of the Federal

Arbitration Act, the parties should come prepared to discuss the proposed scope of discovery in

advance of the summary proceeding, the anticipated trial length, whether a jury is requested, and

proposed trial dates.

DATED this 24 day of September, 2024.

BY THE COURT:

Tena Campbell
United States District Judge